## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KRISTY SHINN, | : | CIVIL NO. 1:23-cv-02097 |
| | : | |
| Plaintiff, | : | (Magistrate Judge Schwab) |
| | : | |
| v. | : | |
| | : | |
| PENNSYLVANIA SCHOOL | : | |
| BOARDS ASSOCIATION, | : | |
| | : | |
| Defendant. | : | |

## <u>MEMORANDUM OPINION</u>

### I. Introduction.

The plaintiff, Kristy Shinn ("Shinn"), claims that her former employer, the Pennsylvania School Boards Association ("PSBA"), created a hostile work environment of sexual harassment due to her sex and retaliated against her for reporting this harassment. She brings these claims under Title VII of the Civil Rights Act of 1964 ("Title VII") and the Pennsylvania Human Relations Act ("PHRA"). 42 U.S.C. § 2000e *et seq.*[1] and 43 P.S. § 951 *et seq.* Currently pending is the PSBA's motion to dismiss (*doc. 14*). For the reasons discussed below, we

---

[1] Shinn cited to Title VII of the Civil Rights Act of 1964 as "29 U.S.C. § 2000e, *et seq.*" *Doc. 1* at 1. We assume Shinn meant 42 U.S.C. § 2000e *et seq.* and, thus, will cite to Title VII under 42 U.S.C. § 2000e *et seq.*

will grant in part and deny in part the PSBA's motion to dismiss, exercising our jurisdiction pursuant to the parties' consent. *See doc. 8*; *see also* 28 U.S.C. § 636(c).

## II.  Background and Procedural History.

### A.  Procedural History.

On May 5, 2023, Shinn filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), which was dually filed with the Pennsylvania Human Relations Commission ("PHRC"). *Doc. 1* at ¶ 7.  On September 17, 2023, Shinn received a Notice of Right to Sue from the EEOC. *Id.* at ¶ 8.  It is undisputed that Shinn thus exhausted her administrative remedies.

On December 18, 2023, Shinn began this action by filing a complaint. *Doc. 1*.  In her complaint, Shinn alleges the PSBA violated her Title VII and PHRA rights by subjecting her to a hostile work environment due to sexual harassment, failing to remedy the sexual harassment, and retaliating against her for her sexual harassment complaint. *Id.* at ¶ 2.  Shinn brings Title VII and PHRA claims for the resulting hostile work environment and retaliation. [2] *Id.* at ¶¶ 126–43.  Shinn seeks

---

[2]  While Shinn's complaint references her race in relation to her retaliation claim, her hostile-work-environment claim only purports to be on the basis of sex. *Doc. 1* ¶¶ 2, 127–130; *see also, doc. 16* at 21–22.

compensatory and punitive damages, costs, disbursements, attorneys' fees, pre-judgment interest, other relief deemed just and equitable, and a favorable verdict to maximize financial recovery. *Id.* at 18–23.

On March 4, 2024, the PSBA filed a motion to dismiss the complaint (*doc. 14*) and a brief in support thereof (*doc. 15*), arguing that Shinn fails to assert facts establishing a hostile work environment or retaliation—specifically, the PSBA argues that Shinn did not allege she was constructively discharged or otherwise subject to an adverse employment action. *See generally doc. 15.*  The motion has now been fully briefed.[3] *See docs. 16, 17.*

### B. Allegations in the Complaint.

On September 7, 2022, Shinn, a Hispanic female, began work for the PSBA as "a Senior Manager of Professional Development in [the] Professional Development Department." *Doc. 1* ¶ 17.  At that time, Shinn's desk was near the office of her direct supervisor, William Smeltzer ("Smeltzer"), the Director of Professional Development and a white male. *Id.* ¶¶ 18, 19.

---

[3] The PSBA requested an oral argument on the Motion to Dismiss. *Doc. 14.* We do not deem it necessary, however, to hear oral arguments on this matter as the motion has been fully briefed.

We also note that the page numbers automatically generated by ECF do not correspond to the page numbers written on the parties' briefs due to their inclusion of a table of contents.  In this memorandum opinion, we cite to the ECF page numbers.

The next day, September 8, 2022, Shinn "dropped off her new hire paperwork with Dara Burke [("Burke"),]" the Associate Director of Employee Engagement, and a white female.  While in Burke's office, Shinn confirmed when asked that, "although she is white-presenting, [she] identifies as Hispanic." *Id.* ¶¶ 21, 22.

On or about September 12, 2022, Shinn had a "standard 'check-in'" meeting one-on-one with Smeltzer in his office with the door shut. *Id.* ¶¶ 23, 24.  During this meeting, Smeltzer told Shinn that he and his wife recently had a baby boy, and "they decided not to circumcise their son's foreskin[,]" and, therefore, "his son's foreskin is still intact." *Id.* ¶¶ 25, 26, 27.  "[Shinn] did not respond to . . . Smeltzer's comments about his son's foreskin." *Id.* ¶ 28.

On October 6, 2022, Smeltzer invited Shinn to go out and get a beer and said "that they should be friends." *Id.* ¶¶ 29, 30.  Shinn declined to get a drink and explained to Smeltzer "that they have a working relationship and not a friendship." *Id.* ¶¶ 31, 32.

On October 17, 2022, Shinn participated in an online meeting with Smeltzer and Nathalia Griffith ("Nathalia"),[4] the E-Learning Manager at the PSBA and a

---

[4] Below, we will introduce Christina Griffiths, the PSBA's Chief Operating Officer.  We mean no disrespect to Nathalia Griffith and Christina Griffiths by using their first names in this opinion; we simply intend to differentiate between two individuals with similar last names who are both involved in Shinn's allegations.

black female. *Id.* ¶ 33. During the meeting, Smeltzer criticized the work product of Nathalia and Shinn and said words to the effect of "there aren't enough white men in some of the stuff we push out and it makes me uncomfortable." *Id.* ¶ 34.

On November 4, 2022, Shinn had a meeting with Smeltzer and Cytha Guynes ("Guynes"), a white female and a Senior Professional Development Manager at the PSBA. *Id.* ¶ 35. Guynes and Shinn had the same role and responsibilities. *Id.* ¶ 36. At the meeting, Shinn told Smeltzer that he treated Guynes and her differently. *Id.* ¶ 37. Smeltzer asked Guynes to leave the meeting, and she left. *Id.* ¶ 38. Shinn then told Smeltzer that he had been treating Shinn differently by looking at Guynes and not Shinn when speaking to both of them, inviting Guynes to do member trainings instead of Shinn, speaking to Shinn in a different tone, requiring Shinn to work more hours than Guynes, and disapproving Shinn's flex time requests more often than he disapproves Guynes's requests. *Id.* ¶ 39. Shinn told Smeltzer "that she is a white-presenting woman of color and asked him to have more self-awareness." *Id.* ¶ 40. Smeltzer responded "that he would work on it." *Id.* ¶ 41.

On November 10, 2022, Shinn was in Smeltzer's office and he was using Shinn's "graphing calculator to look at a specific school district's Board Self-Assessment." *Id.* ¶ 42. Smeltzer asked if Shinn had had trouble with children texting on their phones when she was a teacher. *Id.* ¶ 43. Shinn said that she

occasionally had trouble with students texting on their graphing calculators. *Id.* ¶ 44. Smeltzer then looked at Shinn and said "80085," which is the number sequence "used by children to spell out 'boobs.'" *Id.* ¶¶ 45, 46. Shinn left Smeltzer's office and avoided him for the rest of the day. *Id.* ¶ 47.

On November 16, 2022, Shinn participated in a one-on-one meeting with Smeltzer in his office with the door closed. *Id.* ¶ 48. Smeltzer informed Shinn he would be out of the office that Friday for a medical procedure, and that the procedure was a vasectomy. *Id.* ¶¶ 49, 50. On November 21, 2022, Shinn had several meetings in Smeltzer's office at which Smeltzer made comments about his vasectomy. *Id.* ¶¶ 51, 52. These comments included "I wish I could sit and be comfortable" and "I can't cross my legs because it hurts." *Id.* ¶ 52.

On December 5, 2022, Burke told Shinn via email that her request for a flex schedule allowing her to work remotely on Tuesdays and Thursdays had been approved. *Id.* ¶ 53. On December 23, 2022, Smeltzer "approved Guynes to work remotely due to . . . weather[,]" but Nathalia and Shinn were not informed of the option to work remotely and came into the office. *Id.* ¶ 54.

On January 12, 2023, Shinn participated in a team meeting with Smeltzer, Nathalia, and Guynes. *Id.* ¶ 55. Near the end of the meeting, Nathalia told Smeltzer in front the team that she would no longer have private meetings with Smeltzer, "and that she needed a third person to be present in all meetings between

[] Smeltzer and her." *Id.* ¶ 56.  "Smeltzer told [Nathalia] that they would talk about that after the team meeting." *Id.* ¶ 57.

On January 16, 2023, Shinn had a "check-in" with Smeltzer and she told him "that she was not feeling appreciated or successful." *Id.* ¶¶ 58, 59.  She told Smeltzer that "actions speak louder than words, and that she wanted to celebrate the online course project when it is completed because it has been harder to work on than it needed to be." *Id.* ¶ 60.  In response, Smeltzer told Shinn she should "not be so truthful with other people in the office because they might not take Shinn's 'transparency' as well as he does." *Id.* ¶ 61.

On January 20, 2023, Britta Barrickman ("Barrickman"), the Chief Member Services Officer at the PSBA, told Shinn that the Professional Development Department was being restructured. *Id.* ¶ 62.  Barrickman said that Shinn would now report to her instead of Smeltzer and that Shinn should only speak to Smeltzer about work projects and day-to-day matters. *Id.* ¶ 63.  She also told Shinn to not discuss the reorganization with others at the PSBA because she did not want rumors to be spread. *Id.* ¶ 64.

On January 23, 2023, Smeltzer canceled a one-on-one meeting with Shinn, but later called Shinn into his office to speak privately. *Id.* ¶ 65.  That same day, Megan Orehek ("Orehek"), the PSBA's Senior Director of Marketing and Communications (who is three levels above Shinn), asked Shinn about Smeltzer.

*Id. ¶* 66.  She asked Shinn "what was going on with [Smeltzer] and told [Shinn] that she had not been told anything about it." *Id.*  Orehek told Shinn that Shinn was in the "circle of trust." *Id*. ¶ 67.  Orehek also told Shinn that Orehek "had a meeting later to learn more about it with Christina Griffiths [("Christina")]," who is the PSBA's Chief Operating Officer. *Id.*  Shinn then told Orehek about the inappropriate comments that Smeltzer made and that he was sabotaging Nathalia's and Shinn's work. *Id*. ¶ 68.

The next day, on January 24, 2023, Shinn was working remotely and noticed unusual changes to work that she and Nathalia had completed. *Id.* ¶¶ 69, 70.  Shinn could see via the track changes function in Word that Smeltzer made the changes. *Id.* ¶ 72.  However, when she asked Smeltzer in a Slack Chat whether he had made any changes to the work, he said he had not. *Id.* ¶ 71.

On January 25, 2023, Smeltzer called Shinn on Zoom to let her know about updates he and Orehek had made to the project Shinn was working on. *Id*. ¶ 73.  In response, Shinn told Smeltzer that "she was constantly feeling unsuccessful and that her work on the course was being undone without her knowledge." *Id.* ¶ 74.  Smeltzer asked Shinn "how she thought he felt and [told her] that he felt like he was walking on eggshells." *Id.* ¶ 75.  Smeltzer asked Shinn to talk to him about what was making her feel stressed and uncomfortable. *Id.* ¶ 76.  Shinn told him that she had been instructed not to have one-on-one meetings with him. *Id.* ¶ 77.

After this call, Shinn asked Burke if they could talk, and Burke called Shinn. *Id.* ¶¶ 78, 79. Shinn told Burke that "Smeltzer had been sabotaging her work," that he made "sexually inappropriate and anti-female comments," and "that she feared retaliation for complaining about [] Smeltzer." *Id.* ¶¶ 80, 81. Burke said that "Smeltzer's behavior was unacceptable" and that there were "things in motion to address this issue." *Id.* ¶ 82. Shinn also asked Burke if she could report to someone else when her department was reorganized. *Id.* ¶ 83. Shinn also sent an email documenting their discussion about Smeltzer's inappropriate conduct. *Id.* ¶ 84.

On January 31, 2023, Nathan Mains ("Mains"), the Chief Executive Officer at the PSBA announced that Shane Pagnotti ("Pagnotti") "was promoted to the position of Senior Director of Board Services and Training effective immediately." *Id.* ¶ 85. Shinn's direct supervisor became Pagnotti. *Id.* ¶ 86.

After the announcement, Burke had a meeting in her office with Shinn and Christina. *Id.* ¶¶ 87, 88. Burke told Shinn that Smeltzer was being disciplined: he lost flex schedule privileges and was required to "attend training to learn that what he did was wrong." *Id.* ¶ 89. Then, Christina and Burke told Shinn "that she had a reputation for gossiping" and based on Orehek's report to Christina, Shinn had spread information about Smeltzer in the office. *Id.* ¶ 90. Shinn told them that she "felt safe talking to [] Orehek because she is a leader" and asked them to give an

example of Shinn gossiping about Smeltzer. *Id.* ¶¶ 91, 92.  They "could not" do so. *Id.* ¶ 92.  Burke told Shinn that outside counsel had advised Burke and Christina to terminate Shinn for insubordination, but "that they did not want to fire [Shinn]." *Id.* ¶¶ 93, 94.  Instead, they put Shinn "on a Performance Improvement Plan ("PIP") and her remote work privileges were revoked effective immediately." *Id.* ¶ 95.  Shinn said that these actions were retaliation for her complaints about Smeltzer's inappropriate behavior, but Burke and Christina said that Shinn "was being placed on a PIP for talking to [] Orehek about [] Smeltzer's inappropriate conduct." *Id.* ¶¶ 96, 97.  When Shinn said that "she assumed that the PIP would have measurable goals and due dates," they told her "that the PIP would be 'open-ended' and that they would follow up with [Shinn] the next day." *Id.* ¶¶ 98, 99.  The next day, they did not speak to Shinn or otherwise follow up about the PIP. *Id.* ¶ 100.

On February 1, 2023, Smeltzer was allowed to work from home, despite what Shinn had been told about his discipline. *Id.* ¶ 101.

On February 3, 2023, Barrickman asked Shinn to email her "an outline of [Shinn's] position's duties and responsibilities." *Id.* ¶ 102.  Pagnotti messaged Shinn on Slack on February 10, 2023, and told her "she would not be receiving a performance review due to recent changes." *Id.* ¶ 103.  Shinn asked Pagnotti "to go over the objective and dates for her PIP." *Id.* ¶ 104.  Pagnotti told Shinn he was not

aware that it was his role to review Shinn's PIP with her and that she should "probably ask Burke[.]" *Id.* ¶ 105.  Shinn then messaged Burke and asked Burke to discuss Shinn's PIP. *Id.* ¶ 106.  Burke said she would "circle back with [] [Christina] and get back to [Shinn]." *Id.* ¶ 107.  On February 13, 2023, Burke told Shinn that Pagnotti and Barrickman "were in the middle of reviewing job structures and that [Shinn] would have a meeting once this review was completed." *Id.* ¶ 108.

On February 24, 2023, Shinn emailed Burke a formal complaint of retaliation against the PSBA. *Id*. ¶ 109.  Shinn's complaint (1) "summarized the timeline of events that she believed were retaliatory;" and (2) "requested that [the PSBA] restore her work from home privileges, move [Shinn's] desk away from [] Smeltzer's office, and remove any reference to a PIP from her personnel file by no later than February 27, 2023." *Id.* ¶¶ 110, 111.

Burke sent a letter in response on February 27, 2023, acknowledging receipt of the complaint and stating that the PSBA would investigate Shinn's complaint with outside counsel. *Id.* ¶¶ 112, 113.  Burke also said that the PSBA would not respond to Shinn's requests until the investigation was completed, but she could contact Burke "to discuss options for a different desk location." *Id.* ¶¶ 114, 115.

Shinn responded on February 28, 2023; she reiterated "her request that [the PSBA] restore her work from home privileges immediately" and "requested to be

moved to the cubicle previously occupied by" another employee. *Id.* ¶¶ 116, 117, 118. Shinn also reminded Burke that she had sent documentation to Burke on January 25, 2023, which "outlined [] Smeltzer's inappropriate behavior going back to [Shinn's] first full week of work." *Id.* ¶ 119.

On March 14, 2023, Shinn sent Burke her resignation letter because the PSBA had not restored Shinn's work from home privileges or removed her PIP. *Id.* ¶ 120. The letter also "detailed the reasons for her resignation," and "explained how after she formally reported [ ] Smeltzer's inappropriate behavior, she experienced humiliation and retaliation." *Id.* ¶¶ 121, 122. Shinn's letter also detailed how the PSBA (acting through Christina, Burke, Orehek, Smeltzer and Barrickman) "subjected [Shinn] to a hostile work environment due to her race[] and sex, failed to address [] Smeltzer's sexual harassment, and retaliated against [Shinn] for reporting [] Smeltzer's inappropriate conduct." *Id.* ¶ 123.[5]

_____

[5] Shinn also attached a copy of the resignation letter to her brief in opposition and seeks to rely on additional factual allegations stated in that letter. *Doc. 16* at 14–16. However, Shinn cannot amend her complaint in briefing in response to a motion to dismiss. *See Olson v. Ako*, 724 F. App'x 160, 166 (3d Cir. 2018) ("[I]t is 'axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.' " (quoting *Commonwealth of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988))). "If a court wishes to consider documents outside the pleadings, it must convert the motion to dismiss into a motion for summary judgment." *Fallon Mercy Cath. Med. Ctr. of Se. Pennsylvania*, 877 F.3d 487, 493 (3d Cir. 2017). Shinn argues that the resignation letter falls into an exception to this general rule, because her complaint "explicitly relies on" the resignation letter in paragraphs 120 through 123. *Doc. 16* at 15, n.1 (citing *Fallon*, 877 F.3d at 493 ("a court may consider a document that is

### III. Pleading and Motion-to-Dismiss Standards.

In accordance with Fed. R. Civ. P. 12(b)(6), the court may dismiss a complaint for "failure to state a claim upon which relief can be granted." When reviewing a motion to dismiss under Rule 12(b)(6), "[w]e must accept all factual allegations in the complaint as true, construe the complaint in the light favorable to the plaintiff, and ultimately determine whether plaintiff may be entitled to relief under any reasonable reading of the complaint." *Mayer v. Belichick*, 605 F.3d 223, 229 (3d Cir. 2010). In making that determination, we "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the [plaintiff's] claims are based upon these documents." *Id.* at 230.

"A Rule 12(b)(6) motion tests the sufficiency of the complaint against the pleading requirements of Rule 8(a)." *I.H. ex rel. D.S. v. Cumberland Valley Sch. Dist.*, 842 F. Supp. 2d 762, 769–70 (M.D. Pa. 2012). "Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a 'short and plain statement of the

_____

'integral to or explicitly relied upon' in the complaint")). However, while Shinn explicitly *refers to* the resignation letter in her complaint, the existence of the letter is not something she *relies upon* to establish any of the elements of her claims. Shinn's resignation letter provides some additional details for her claims, but if she wished for the court to consider those allegations as true at the pleading stage, she needed to include them in her complaint. At best, we could consider that Shinn submitted the resignation letter and that the letter said what it says, but we cannot assume the truth of the contents of letter when Shinn elected not to include them in her verified complaint.

claim showing that the pleader is entitled to relief.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 677–78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)).  The statement required by Rule 8(a)(2) must give the defendant fair notice of the nature of the plaintiff's claim and of the grounds upon which the claim rests. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007).  Detailed factual allegations are not required, but more is required than "labels," "conclusions," or "a formulaic recitation of the elements of a cause of action." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "In other words, a complaint must do more than allege the plaintiff's entitlement to relief." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).  "A complaint has to 'show' such an entitlement with its facts." *Id.*

In considering whether a complaint fails to state a claim upon which relief can be granted, the court "'must accept all facts alleged in the complaint as true and construe the complaint in the light most favorable to the nonmoving party.'" *Krieger v. Bank of Am., N.A.*, 890 F.3d 429, 437 (3d Cir. 2018) (quoting *Flora v. Cty. of Luzerne*, 776 F.3d 169, 175 (3d Cir. 2015)).  But a court "need not credit a complaint's bald assertions or legal conclusions when deciding a motion to dismiss." *Morse v. Lower Merion Sch. Dist.,* 132 F.3d 902, 906 (3d Cir. 1997).  A court also need not "assume that a . . . plaintiff can prove facts that the . . . plaintiff has not alleged." *Associated Gen. Contractors of Cal. v. California State Council of Carpenters,* 459 U.S. 519, 526 (1983).

Following *Twombly* and *Iqbal,* a well-pleaded complaint must contain more than mere legal labels and conclusions. Rather, it must recite factual allegations sufficient to raise the plaintiff's claimed right to relief beyond the level of mere speculation. In practice, consideration of the legal sufficiency of a complaint entails a three-step analysis:

> First, the court must "tak[e] note of the elements a plaintiff must plead to state a claim." Second, the court should identify allegations that, "because they are no more than conclusions, are not entitled to the assumption of truth." Finally, "where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."

*Santiago v. Warminster Tp.,* 629 F.3d 121, 130 (3d Cir. 2010) (footnote and citations omitted) (quoting *Iqbal,* 556 U.S. at 675, 679).

In sum, "[w]e accept as true all factual matters [the plaintiff] alleges, but this complaint cannot survive unless the facts it recites are enough to state plausible grounds for relief." *Beasley v. Howard*, No. 20-1119, 2021 WL 4233947, at *2 (3d Cir. Sept. 17, 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. But "[a] claim that relies just on 'conclusory statements,' or on 'threadbare recitals of the elements of a cause of action' without

supporting factual allegations, does not establish plausible grounds for relief." *Id.* (quoting *Fischbein v. Olson Rsch. Grp., Inc.*, 959 F.3d 559, 561 (3d Cir. 2020)).

## IV. Discussion.

Shinn brings claims under both Title VII and the PHRA. We have federal question jurisdiction over Shinn's Title VII claims and supplemental jurisdiction over Shinn's state law PHRA claims. 28 U.S.C. §§ 1331, 1367. Generally, claims under the PHRA are interpreted coextensively with and analyzed under the same framework as claims under Title VII. *See e.g.*, *Faush v. Tuesday Morning, Inc.*, 808 F. 3d 208, 213 (3d Cir. 2015); (citing *Brown v. J. Kaz, Inc.*, 581 175, 179, n,1 (3d Cir. 2009); *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 454 n.6 (3d Cir. 2006). For the reasons discussed below, we conclude that Shinn has not sufficiently pled her hostile-work-environment claims, but she has sufficiently pled her retaliation claims.

### A. Hostile Work Environment – Sexual Harassment.

The general discrimination provision of Title VII provides that it is "an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,

because of such individual's race, color, religion, sex, or national origin." 42

U.S.C. § 2000e–2(a)(1).  The Supreme Court has made clear that Title VII is

violated "[w]hen the workplace is permeated with 'discriminatory intimidation,

ridicule, and insult,' . . . that is 'sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working

environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal

citations omitted).  A claim alleging such working conditions is commonly called a

hostile-work-environment claim. *See id.* at 18–19.

In order to prevail on a hostile-work-environment claim, a plaintiff must

establish (1) that she suffered intentional discrimination because of a protected

characteristic, (2) that the discrimination was severe or pervasive; (3) that the

discrimination detrimentally affected her; (4) that the discrimination would have

detrimentally affected a reasonable person of like characteristics in like

circumstances; and (5) the existence of *respondeat superior* liability. *Huston v.*

*Proctor & Gamble Paper Products Corp.,* 568 F.3d 100, 104 (3d Cir. 2009).  "The

first four elements establish a hostile work environment, and the fifth element

determines employer liability." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157,

167 (3d Cir. 2013).  Of course, at the motion-to-dismiss stage, a plaintiff need not

prove her case.  While it is sufficient to allege a prima facie case of discrimination

to defeat a motion to dismiss, it is not necessary.  Rather "[t]he complaint need

only allege enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary element." *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) (internal quotations omitted).

The PSBA argues that Shinn's hostile-work-environment claims should be dismissed because she has not alleged that she was subject to severe or pervasive discrimination, (*doc. 15* at 11–12), she has not pled that her discrimination was based on sex (*id.* at 11), her complaint establishes the PSBA's *Ellerth-Faragher* defense (*id.* at 12–14), and she has not shown she was constructively discharged (*id.* at 14–16).[6] Because we find that Shinn has not alleged that she was subject to severe or pervasive discrimination, we do not reach the PSBA's other arguments.

For workplace harassment to be actionable, it must be sufficiently severe or pervasive to alter the conditions of the plaintiff's employment and create an abusive working environment. *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986). "The 'severe or pervasive' standard is disjunctive and so 'a plaintiff

---

[6] The PSBA argues that Shinn's hostile-work-environment claim must fail because she has not shown she was constructively discharged as a result of the allegedly hostile work environment. *Doc. 15* at 14–16. However, as Shinn points out, constructive discharge is not an element of a hostile-work-environment claim. *Doc. 16* at 24. While the PSBA is correct that Title VII claims generally must be premised on an adverse employment action, in a hostile-work-environment claim, it is the hostile work environment itself that is the adverse employment action. *See, e.g., Greer v. Mondelez Glob., Inc.,* 590 F. App'x 170, 173 (3d Cir. 2014) ("[A] plaintiff may prove an adverse employment action by proving that he or she was subjected to a hostile work environment." (citing *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 66–67 (1986)).

need not show that her hostile working environment was both severe and
pervasive; only that it was sufficiently severe or sufficiently pervasive, or a
sufficient combination of these elements, to have altered her working conditions.'"
*Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 215 n.12 (3d Cir. 2017) (quoting
*Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 119 (2d Cir.
2010)).  Thus, "'some harassment may be severe enough to contaminate an
environment event if not pervasive; other less objectionable, conduct will
contaminate the workplace only if is pervasive.'" *Castleberry v. STI Grp.*, 863 F.3d
259, 264 (3d Cir. 2017) (quoting *Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir.
2006)).  But "'isolated incidents (*unless extremely serious*) will not amount to
[harassment]." *Id.* (quoting *Jensen*, 435 F.3d at 449 n.3) (emphasis in original).

"When the workplace is permeated with 'discriminatory intimidation,
ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions
of the victim's employment and create an abusive working environment,' Title VII
is violated." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21 (1993) (quoting
*Meritor Savings Bank,* 477 U.S. at 65, 67).  The "conduct must be extreme to
amount to a change in the terms and conditions of employment." *Faragher*, 524
U.S. at 788.  "Although the bar for establishing severe or pervasive discrimination
is relatively high, the determination of what constitutes severe or pervasive does
not lend itself to a mathematically precise test." *Fedder v. Bloomsburg Univ. of*

*Pennsylvania*, No. 4:23-CV-01678, 2024 WL 580552, at \*3 (M.D. Pa. Feb. 13,

2024) (internal quotation marks and citation omitted).  Whether an environment is

hostile or abusive can be determined only by looking at all the circumstances.

*Harris,* 510 U.S. at 23.  The circumstances "may include the frequency of the

discriminatory conduct; its severity; whether it is physically threatening or

humiliating, or a mere offensive utterance; and whether it unreasonably interferes

with an employee's work performance." *Id.*  "'[S]imple teasing,' offhand

comments, and isolated incidents (unless extremely serious) will not amount to

discriminatory changes in the 'terms and conditions of employment.'" *Faragher*,

524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Services, Inc.,* 523 U.S.

75, 82 (1998)).

  Here, Shinn's alleged workplace harassment was neither severe nor

pervasive.  In the complaint, Shinn alleges a number of incidents that she contends

crossed the line of appropriate workplace conduct: (1) Smeltzer discussed his son's

circumcision with Shinn in his office with the door closed (*doc. 1* ¶¶ 23–28);

(2) Smeltzer invited Shinn out for beer (which she declined) (*id*. ¶¶ 29–32);

(3) Smeltzer, while alone with Shinn in his office, made a reference to students

inputting numbers to spell "boobs" on graphing calculators (*id*. ¶¶ 42–47);

(4) Smeltzer told Shinn in a closed-door meeting that he was getting a vasectomy

and then, during several subsequent meetings, Smeltzer commented on his pain

and discomfort after the procedure (*id.* ¶¶ 48–52); and (5) Smeltzer criticized the work product of Nathalia and Shinn and said words to the effect of "there aren't enough white men in some of the stuff we push out and it makes me uncomfortable" (*id.* ¶ 34). Notably, these incidents occurred over a period of four-to-five-months.

Overall, while Shinn points to comments that she felt were inappropriate, they fall in the category of isolated and offhand remarks, none of which was severe, physical threatening, or humiliating. And isolated and offhand comments are insufficient to create a hostile work environment. *See Faragher,* 524 U.S. at 788 (1998) (stating that offhand comments are not sufficient to establish a hostile-work environment); *Greer v. Mondelez Global, Inc.*, 590 F. App'x 170, 173 (3d Cir. 2014) (stating that offensive utterances are not sufficient to create a hostile environment).

We are mindful that, in analyzing whether there are allegations that could support a hostile work environment, we cannot look at statements of incidents in isolation. Rather, we must consider the totality of the circumstances and the entire scenario regarding Shinn's work environment. *Harris,* 510 U.S. at 23 ("[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances."); *Cardenas v. Massey*, 269 F.3d 251, 261-62 (3d Cir. 2001) ("[T]he advent of more sophisticated and subtle forms of discrimination requires

that we analyze the aggregate effect of all evidence and reasonable inferences therefrom, including those concerning incidents of facially neutral mistreatment, in evaluating a hostile work environment claim."); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1484 (3d Cir. 1990) ("A play cannot be understood on the basis of some of its scenes but only on its entire performance, and similarly, a discrimination analysis must concentrate not on individual incidents, but on the overall scenario.").  Thus, we consider the comments cited by Shinn along with the other alleged conduct and incidents that form Shinn's hostile-work-environment claims. *See Caver v. City of Trenton*, 420 F.3d 243, 264 (3d Cir. 2005) ("Although the racist comments involved in this case cannot alone be the basis of a hostile work environment claim, evidence of those comments may be considered in determining whether facially neutral conduct . . . was actually based on Davis' race."); *see also Tourtellotte v. Eli Lilly & Co.,* No. CIV.A. 09-0774, 2013 WL 1628608, at *5 (E.D. Pa. Apr. 16, 2013), *aff'd,* 636 F. App'x 831 (3d Cir. 2016) (finding "sporadic references to [the plaintiff] as 'honey' and [an] offhanded comment about [the plaintiff] getting clients to see past her pretty face," along with comments not directed at the plaintiff did not "rise to the level of extreme conduct sufficient to change the terms and conditions of [the plaintiff's] employment.").

Here, Shinn describes concerns that Smeltzer was "sabotaging" her work and that on one occasion he edited her work without admitting he did so. *Doc. 1*

¶¶ 68, 70–72.  Shinn also alleges that another person in the workplace (Nathalia) had a problem with Smeltzer and refused to have future one-on-one meetings with him. *Id.* ¶ 56.   These vague allegations, however, do little to advance her hostile-work-environment claim.  Shinn does not allege that she witnessed any inappropriate behavior by Smeltzer towards Nathalia, or even that she was aware of the cause of Nathalia's complaints.  Moreover, Shinn does not expand on how Smeltzer was "sabotaging" her work.  Viewing all the circumstances alleged by Shinn, we conclude that she has failed to allege that she experienced severe or pervasive discrimination.

We note that Shinn argues she has raised enough facts to raise a reasonable expectation that discovery will reveal additional evidence of her hostile work environment. *Doc. 16* at 20. (citing *Martinez,* 986 F.3d at 266).  However, unlike evidence of a defendant's motivation or other evidence that would primarily be within the knowledge of only a defendant, the atmosphere in which Shinn worked is not something discovery is needed to uncover.  Rather, it is a question of Shinn's own experience in the workplace.  Shinn was required to plead sufficient facts that, if true, would amount to an abusive working environment.  Pursuant to Fed. R. Civ. P. 15(a), a court "should freely give leave [to amend] when justice so requires."  Here, in light of this liberal amendment standard, we will grant Shinn leave to amend her complaint as to her hostile-work-environment claims.  If Shinn

has additional allegations about her workplace conditions that she believes rise to this level, she should include them in an amended complaint.

### B. Retaliation.

Shinn also presents a Title VII claim and a PHRA claim that the PSBA retaliated against her for her earlier complaints of discrimination. "To establish a prima facie case of retaliation, a plaintiff must show that (1) she engaged in protected activity under Title VII; (2) the employer took an adverse action against her; and (3) there was a causal connection between her protected activity and the adverse employment action." *Wilkerson v. New Media Technology Charter School Inc.*, 522 F.3d 315, 320 (3d Cir. 2008). "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013). Shinn will ultimately need to show "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Id*. However, "at the prima facie stage, a plaintiff need only proffer evidence sufficient to raise the inference that her engagement in a protected activity was the *likely reason* for the adverse employment action, not the but-for reason." *Carvalho-Grevious v. Delaware State Univ*., 851 F.3d 249, 253 (3d Cir. 2017).

24

The PSBA argues that Shinn has failed to plead the second prong of retaliation: an adverse employment action. *Doc. 15* at 16–20.  The PSBA argues that the only actions Shinn alleges the PSBA took against her after she raised her complaint were (1) Burke's indication that a PIP would be issued and (2) the rescission of Shinn's work from home privileges. *Doc. 15* at 18.  In her brief in opposition, Shinn, however, argues that she alleges not only that she was issued a PIP and had her remote work privileges revoked, but also that she was threatened with termination. *Doc. 16* at 26.  Shinn thus argues that viewed together, these circumstances satisfy the adverse employment action requirement for retaliation claims. *Id.* at 26–27.

To prevail on a Title VII retaliation claim, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse[.]" *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 54, 126 S. Ct. 2405, 165 L.Ed.2d 345 (2006).  This "test was meant to capture those (and only those) employer actions serious enough to 'dissuade[] a reasonable worker form making or supporting a charge of discrimination.'" *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 357, 144 S.Ct. 967, 218 L.Ed. 2d 322 (2024). The adverse action must rise above "those petty slights or minor annoyances that often take place at work and that all employees experience." *Burlington Northern and Santa Fe Ry. Co.*, 548 U.S. at 68.

Here, Shinn alleges that she was put on a PIP, had her remote work privileges revoked, and was told that there had been discussions of terminating her employment. "Several district courts in the Third Circuit have held that placement on a performance improvement plan does not meet [the adverse action] standard." *Leiman v. Nutrisystem, Inc.*, No. 18-3358, 2019 WL 2866118, *7 (E.D. Pa. July 3, 2019) (collecting cases). Nevertheless, the Third Circuit has previously described PIPs as "typically comprised of directives relating to an employee's preexisting responsibilities." *Reynolds v. Dep't of Army*, 439 Fed. Appx. 150, 153 (3d Cir. 2011). Shinn's PIP as alleged, however, contained no measurable goals. *See doc. 1* ¶¶ 98, 99. Furthermore, Shinn also had her remote work privileges revoked.

Shinn points to a Western District of Pennsylvania decision that, albeit deciding a motion for summary judgment, still has some relevance here. *Doc. 16* at 26. Specifically, the Western District of Pennsylvania found that "it is a question of fact for the jury to determine whether a reasonable employee would find that being prohibited from working from home . . . was materially adverse." *Yeager v. UPMC Horizon*, 698 F. Supp. 2d 523, 546 (W.D. Pa. 2010). In *Yeager*, the plaintiff was also "a single parent taking classes towards her master's degree at the time," which made the discontinuation of working from home particularly challenging. *Id*.

26

The PSBA, on the other hand, points to two cases that found restrictions on remote work not to be adverse actions. *See doc. 15* at 19 (citing *Seldon v. Nat'l R.R. Passenger Corp.,* No. CIV.A. 05-4165, 2007 WL 3119976, at *3 (E.D. Pa. Oct. 24, 2007) (finding at summary judgment that "[t]he plaintiff ha[d] not provided sufficient evidence that [the defendant's] refusal to allow her into a small pilot program that would alter only the location of her work—not the job she did, not the hours she worked, not the compensation she received—is such a significant change."); *Robinson v. Horizon Blue Cross Blue Shield of N.J.,* No. 2:12-cv-02981-ES-JAD, 2015 U.S. Dist. LEXIS 99491, *12 (D.N.J. July 30, 2015) ("The Court agrees with Defendants that the denial of Plaintiff's request to work from home is not an adverse employment action."). But in *Seldon*, the issue was admittance to a "small pilot program" permitting remote work, and in *Robinson,* the plaintiff's request to work from home had been *denied*, not revoked. *Robinson,* 2015 U.S. Dist. LEXIS 99491 at *12.

Here, it was not merely that Shinn was denied a request to work from home, her previous approval to work from home was rescinded. At this preliminary stage, therefore, we will not dismiss Shinn's retaliation claims based on a failure to allege an adverse action.[7]

---

[7] Alternatively, in the context of retaliation claims, plaintiffs may satisfy the adverse employment action element by pleading a constructive discharge. *LaRochelle v. Wilmac Corp.,* 210 F.Supp.3d 658, 704–06 (E.D. Pa. 2016). "Under

**VII.  Conclusion.**

For the foregoing reasons, we grant in part and deny in part the PSBA's

motion to dismiss (*doc. 14*).  Specifically, we grant the PSBA's request to dismiss

Shinn's claim of hostile work environment under Title VII and the PHRA and deny

the PSBA' request to dismiss Shinn's retaliation claims under Title VII and the

PHRA.  Shinn's hostile-work-environment claims are dismissed with leave to

amend. An appropriate order will be issued.


<u>**S/Susan E. Schwab**</u>
Susan E. Schwab
United States Magistrate Judge

---

the constructive discharge doctrine, an employee's reasonable decision to resign
because of unendurable working conditions is assimilated to a formal discharge for
remedial purposes." *Pa. State Police v. Suders*, 542 U.S. 129, 141 (2004).  Here,
Shinn alleges that the above-described circumstances led to her resignation, and,
therefore, Shinn was constructively discharged.  The PSBA, however, argues that
Shinn's treatment was not "intolerable, let alone so intolerable that a reasonable
person in Shinn's position would have felt compelled to resign." *Doc. 15* at 16.
Because we concluded above that Shinn experienced adverse action in the form of
the removal of her remote work privileges, we do not reach the question of whether
Shinn was constructively discharged.